# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ANGELINA A. TEW on behalf of herself
and as Personal Representative and
Administratrix of the Estate of
Adam Dean Clark,

    Plaintiff,

vs.                                     CA 18-0176-CG-MU

FAIRHOPE YACHT CLUB,

    Defendant.

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(S), on Defendant Fairhope Yacht Club's motion to dismiss with prejudice (Doc. 5), Plaintiff's response in opposition (Doc. 18), and Defendant's reply (Doc. 19). Based upon the contents of these pleadings and of the Complaint (Doc. 1), and consistent with the report and recommendation already entered in *Brown v. Fairhope Yacht Club,* 18-0061-CG-MU, the Magistrate Judge **RECOMMENDS** that the Defendant's motion to dismiss with prejudice (Doc. 5) be **DENIED**.

## PROCEDURAL BACKGROUND AND COMPLAINT ALLEGATIONS

On April 13, 2018, Plaintiff Angelina A. Tew ("Plaintiff" or "Tew"), on behalf of herself and as Personal Representative and Administratrix of the Estate of Adam Dean Clark, filed a complaint in this Court against Defendant Fairhope Yacht Club ("Defendant" or "FYC"). (Doc. 1). In her complaint, Tew asserts claims against FYC for the wrongful death of her son. (*Id.* at 6-8.) Defendant FYC filed the instant motion to

dismiss all claims with prejudice on April 17, 2018. (Doc. 5.) Plaintiff filed her response and brief in opposition on May 1, 2018 (Doc. 18), and Defendant its reply on May 15, 2018 (Doc. 19). Briefing has closed (*see* Doc. 14), so this motion is now ripe for a decision.

For consideration of this motion to dismiss, Plaintiff's factual allegations have been accepted as true and viewed in the light most favorable to her, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). A summary of those allegations follows.

On April 25, 2015, Defendant FYC sponsored and hosted the 2015 Dauphin Island Race, a boat race that began in Baldwin County, Alabama, and concluded at Dauphin Island in Mobile County, Alabama. (*See* Doc. 1, at ¶¶ 4 & 6). In the months leading up to the race, FYC's Race Committee, the group responsible for the planning and safe conduct of the race, chose not to develop any form of safety plan to respond to emergencies that might arise during the race, nor did it create any weather plan to inform its decision-making in the event of severe weather. (*Id*. at ¶ 5). Before the race, FYC applied to the United States Coast Guard ("USCG" or "Coast Guard") for a permit to conduct the race. (*Id*. at ¶ 6). In its application, FYC represented to the USCG that no unusual hazards to participants would be introduced into the Regatta Area. (*Id*.). And while FYC listed no specific vessels it would provide to ensure a safe race, it represented that it deemed its patrol adequate for safety purposes and requested no Coast Guard or Coast Guard Auxiliary Patrol. (*Id*.)

The USCG issued the permit and made it clear that FYC was responsible for the safe conduct of the event, including, but not limited to, instruction to and qualification of

2

participants, safety equipment inspections, and rescue and first aid facilities. (*Id*. at ¶ 7). The Coast Guard also instructed FYC that it "must be constantly aware of weather forecasts and conditions so that unsafe conditions can be identified and responded to, including termination of the event if necessary to ensure safety of all participants." (*Id*.). The USCG permit specifically stated that: "This permit is issued on the condition that the sponsor furnish a sufficient number of rescue vessels to provide adequate safety for all participants. These vessels must be adequately identified as Event Committee Boats. They are direct representatives of the sponsor who is responsible for briefing and coordinating each vessel 's operation ensuring positive control for the event." (*Id*.).

FYC's Principal Race Officer and current Commodore, Anne Fitzpatrick, has previously testified that the FYC is a member of the United States Sailing Association and looks to that entity for guidance. (*Id.* at ¶ 8). That Association's Race Management Handbook reads, in relevant measure, as follows: "If foul weather threatens, or there is any reason to suspect that the weather will deteriorate—for example, lightning or a heavy squall—making conditions unsafe for sailing or for your operations, the prudent and practical thing to do is abandon the race. . . . [I]n deciding to postpone, shorten, or abandon for foul weather, the race committee's job is to exercise good judgment, not win a popularity contest. Make your decisions based on consideration of all competitors, especially the least experienced or least capable competitors. Don't worry if conditions moderate later and make you look overcautious. Your concern is the

safety of participants." (*Id.*)[1].

The evening before the race, at 6:11 p.m., the National Oceanic and Atmospheric Administration ("NOAA") issued a weather forecast indicating that severe thunderstorms were possibly headed towards the Mobile Bay area. (*Id.* at ¶ 10). On the morning of the race, April 25, 2015, at 3:48 a.m., the NOAA's weather forecast indicated severe thunderstorms possible near the Mobile Bay area. (*Id.* at ¶ 11). The National Weather Service ("NWS") in Mobile also issued severe thunderstorm warnings for Mobile and Baldwin Counties on the morning of the race. (*Id.*). FYC hosted a breakfast event from 7:30 a.m. to 8:30 a.m. for race participants. (*Id.*). The race was originally scheduled to begin at 9:30 a.m. (*id.*); however, at approximately 7:44 a.m. on race day, FYC caused a cancellation notice to be posted on its website for about 30 minutes. The notice stated that the race had been cancelled due to inclement weather (*id.* at ¶ 12). The cancellation notice was removed at the direction of FYC at about 8:10 a.m. (*Id.*)[2].

Before the start of the race, all participants were informed that FYC would communicate with them on Channel 68 of the VHF radio band, as well as by means of flags. (*Id.* at ¶ 13). Due to FYC's original decision to cancel the race, the start time of the race was delayed and FTC also ordered a restart of the already delayed race that further delayed the official start. (*Id.* at ¶ 14). The race ultimately began at 11:00 a.m.,

---

[1] Plaintiff avers in her Complaint that FYC charged participants an entry fee, incentivized them with trophies and winner's lists, and, otherwise, solicited sponsorships and advertisers for the race. (*Id.* at ¶ 9.)

[2] Plaintiff asserts that the FYC cancelled and moved two other yearly Dauphin Island Races, one in 2010 and another in 2016, on account of inclement weather. (*Id.*).

instead of the originally scheduled 9:30 a.m. start time. (*Id*.). In all, approximately 476 people were on board 117 boats when the race began after the restart. (*Id*.).

At about 1:35 p.m., the Storm Prediction Center posted another severe thunderstorm watch for the Mobile Bay area. (*Id*. at ¶ 15). At approximately 2:21 p.m., the NWS in Mobile issued another severe thunderstorm warning for Mobile County as a line of storms approached from the western border of Alabama. (*Id*. at ¶ 16). Around 2:30 p.m., the USCG contacted the FYC's Race Committee aboard the Race Committee Boat at the finish line by phone and advised that potentially severe weather was incoming. (*Id*. at ¶ 17). Shortly thereafter, the USCG made a VHF radio transmission to the Race Committee Boat stating that it was "on station" nearby. (*Id*.). At about 2:47 p.m., the NWS issued a second severe thunderstorm warning, this one for the Baldwin County area. (*Id*. at ¶ 18). At around 3:10 p.m., the storm entered Mobile Bay from the west. (*Id*. at ¶ 19). As a result of the delayed start, most of the boats in the race were still in Mobile Bay at 3:10 p.m. (*Id*. at ¶ 20). At approximately 3:15 p.m., Middle Bay Lighthouse recorded a wind gust of 73 MPH, which is one MPH under hurricane strength. (*Id*. at ¶ 21). Authorities issued marine warnings in addition to land warnings. (*Id*. at ¶ 22).

As the deadly storm entered Mobile Bay, Fitzpatrick, FYC's Principal Race Officer, and Race Committee Co-Chairman, John Hirsch, occupied a forty-eight (48) foot motor yacht positioned at the finish line near Dauphin Island. (*Id*. at ¶ 23). This vessel, owned and/or controlled by Hirsch and/or Fitzpatrick, as representatives of FYC, was capable of safely rendering assistance to nearby boats in danger of sinking. (*Id*.). However, despite their awareness and warning as to the danger nearby race

5

participants faced, Fitzpatrick and Hirsch chose not to share weather warnings on VHF Channel 68 and chose not to participate in any rescue efforts until the race's scheduled finish time, almost two hours after the storm hit. (*Id.*; *see id.* at ¶ 13). During the storm, the boat carrying Plaintiff's decedent, Adam Clark, capsized on the Mobile County side of Mobile Bay, and Clark drowned. (*Id*. at ¶ 24). A total of ten (10) boats sank during the race, putting forty (40) people into the water, six (6) of whom, like Adam Clark, lost their lives. (*Id.*). A total of half the boats in FYC's race fleet were unable to finish the race. (*Id.*).

Count One of Plaintiff's Complaint asserts a cause of action for negligence. (Doc. 1, at 6-7). Plaintiff alleges that Defendant sponsored a yacht race and had a duty to exercise due care for race participants. (*Id*. at ¶ 26). Plaintiff further alleges that FYC's decision to reverse its initial decision to cancel the race due to the threat of inclement weather was negligent, and that its negligence in this regard caused the boat occupied by Adam Clark to be positioned directly in the path of the storm. (*Id*. at ¶¶ 26-27). Plaintiff also alleges that Defendant negligently induced and incentivized race participants to race in extremely dangerous severe weather, negligently failed to warn the race participants of the approaching severe weather system despite the call from the USCG, and negligently or willfully violated its USCG permit when it failed to provide for sufficient safety and rescue boats, failed to be constantly aware of weather forecasts and conditions so that unsafe conditions could be identified, failed to communicate with participants regarding unsafe conditions, and failed to terminate the event to ensure the safety of all participants. (*Id*. at ¶¶ 28-30). Plaintiff avers that these actions by FYC constitute breaches of its duty to exercise reasonable or due care as

6

identified in the USCG permit and the United States Sailing Association's Race Management Handbook and, further, that as a proximate consequence, Adam Clark was killed. (*Id.* at ¶ 31).

In Count Two, Plaintiff asserts a cause of action against Defendant FYC for failure to provide assistance at sea as required by 46 U.S.C. § 2304. (Doc. 1, at 7-8). Tew alleges that the co-chairs of FYC's race committee, who were anchored at the finish line aboard a 48-foot motor yacht, were aware or should have been aware of the general location of Clark's vessel and the imminent danger he and the other occupants of the vessel faced and deliberately failed to render assistance to them. Plaintiff Tew alleges further that FYC race representatives were capable of safely rendering assistance to the stranded race participants but chose to do nothing until two hours after the storm had passed, at the scheduled end time of the race, though rescue efforts by other was well underway. (*Id*. at ¶ 33). Plaintiff avers that the deliberate inaction of Hirsch and Fitzpatrick breached their duty to render assistance to Clark under § 2304 and, as a proximate consequence of their deliberate inaction, Clark drowned. (*Id.* at ¶ 34).

In Count Three of her Complaint, Plaintiff asserts that Defendant's wanton or gross negligence caused her son's death. (Doc. 1, at 8). Specifically, Plaintiff alleges that FYC wantonly disregarded its duty to warn the race participants of the severe weather alerts issued by the various news and weather outlets generally, and directly to Defendant by the USCG. (*Id.* at ¶ 37). Plaintiff also alleges that Defendant acted wantonly by failing to cancel the race (*id.*) and placing its own interests above the safety of the race participants, without regard to its obligations under the USCG permit

7

and as a member of the United States Sailing Association in sponsoring such a race. (*Id.* at ¶ 38). Plaintiff avers that as a proximate consequence of the wantonness or gross negligence of FYC, her son was killed. (*Id.* at ¶ 39.)

## **CONCLUSIONS OF LAW**

**A.** **Pleading Standard.** The sufficiency of Plaintiff's claims to proceed beyond the pleading stage, and into discovery, is governed by the plausibility standard articulated by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and further detailed in *Ashcroft v. Iqbal, supra*. In *Twombly,* the United States Supreme Court expressly abrogated the *Conley v. Gibson,* 355 U.S. 41 (1957) "no set of facts" pleading standard, holding that test "has earned its retirement" and "is best forgotten." *Twombly*, 550 U.S. at 563, 127 S.Ct. at 1969; *Simpson v. Sanderson Farms, Inc.,* 744 F.3d 702, 714 (11th Cir. 2014) ("[T]he Supreme Court categorically retired [the no set of facts test] in *Twombly*.").

Post *Twombly,* "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. The Court made clear that to satisfy the requirements of Fed.R.Civ.P 8(a) "something beyond the mere possibility [of an entitlement to relief] must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people[.]" *Id.* at 557-58, 127 S.Ct. at 1966 (internal quotation marks omitted; citations omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d

8

1244, 1254 (11th Cir. 2012) (citations omitted), *cert. denied,* 568 U.S. 1088, 133 S.Ct. 856, 184 L.Ed.2d 656 (2013).

The Court directed that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly,* 550 U.S. at 558, 127 S.Ct. at 1966 (internal quotations marks and ellipses omitted; citations omitted). "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process[.]" *Id*. at 559, 127 S.Ct. at 1967. "[T]he threat of discovery expense will push cost-conscious defendants to settle even anemic cases…[;] it is only by taking care to require allegations that reach the level [of showing a plausible entitlement to relief] that we can hope to avoid the potentially enormous expense of discovery[.]" *Id.*

The Eleventh Circuit has likewise emphasized the importance of only allowing plausible claims to proceed beyond the pleading stage: "Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6) together establish a notice-pleading standard that is applied, in a context-specific manner, with the recognition that the imposition of litigation costs must be justified at the threshold by the presence of factual allegations making relief under the governing law plausible, not merely speculative." *ABB Turbo Sys. AG v. Turbousa, Inc.* 774 F.3d 979, 984 (11th Cir. 2014); *see Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1367 & 1367-68 (11th Cir. 1997) (recognizing that "[d]iscovery imposes several costs on the litigant from whom discovery is sought[]" and "discovery imposes burdens on the judicial system; scarce judicial resources must be diverted from other cases to resolve discovery disputes."); Fed.R.Civ.P. 1 (recognizing that the Rules

9

of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

In *Iqbal,* the Supreme Court gave additional definition to the Rule 8(a) analysis framed in *Twombly*. The Court explained that under *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949 (internal citations omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679, 129 S.Ct. at 1950. Courts do not "'accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* at 678, 129 S.Ct. at 1950 (citation omitted); *see also id.* at 678, 129 S.Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[.]").

The *Iqbal* Court made clear that "[t]he pleading standard Rule 8 announces…demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678, 129 S.Ct. at 1949 (internal citations omitted). Consequently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679, 129

10

S.Ct. at 1950 (brackets and citation omitted). Therefore, dismissal of a factually insufficient complaint is required because "Rule 8…does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79, 129 S.Ct. at 1950.

In *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010), the Eleventh Circuit Court of Appeals distilled the *Twombly/Iqbal* pleading standard into a functional "two-prong approach" for the evaluation of the sufficiency of a plaintiff's pled allegations: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* at 1290 (citation omitted). The Eleventh Circuit also explained: "Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (citation omitted).

Additionally, it is well-established that dismissal is required when the factual averments in a complaint affirmatively foreclose the existence of a plausible entitlement to relief. *See, e.g., Villarreal v. R.J. Reynolds Tobacco Co.,* 839 F.3d 958, 971 (11th Cir. 2016) ("A plaintiff nonetheless can plead himself out of court by alleging facts that foreclose a finding of diligence or extraordinary circumstances, both of which are required for equitable tolling."), *cert. denied,* ___ U.S. ___, 137 S.Ct. 2292, 198 L.Ed.2d 724 (2017); *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618, 621 (11th Cir. 1983) ("[A] party is bound by the admissions in his pleadings."). "[A]

11

Case 1:16-cv-00176-CG-MU Document 21 Filed 05/22/18 Page 12 of 17

plaintiff can plead himself out of court. If he alleges facts that show he isn't entitled to a judgment, he's out of luck." *Early v. Bankers Life & Cas. Co.,* 959 F.2d 75, 79 (7th Cir. 1992) (internal citations omitted).

  **B.**   **Analysis.**   In this case, the undersigned will not substantively deviate from the analysis in *Brown v. Fairhope Yacht Club,* CA No. 18-0061-CG-MU, Doc. 24, and, instead, simply sets out that same analysis, with only minor additions. As in *Brown,* FYC's motion to dismiss (with prejudice) for failure to state a claim is based upon its contention that it owed no duty as the entity that conducted the 2015 Dauphin Island Race to the participants in the race under the general maritime law, and, therefore, cannot be held liable in this action. (*See* Doc. 5). Plaintiff argues that her Complaint does indeed set forth facts which show that Defendant owed her decedent a duty. (*See* Doc. 18). Thus, the sole issue before the Court at this juncture is whether Plaintiff's Complaint, when taking all allegations contained therein as true, demonstrates that Defendant had or assumed a duty to participants in the race it conducted.[3]

  The parties agree that Plaintiff has asserted her claims under the general maritime law. (*Compare* Doc. 1, at 1 & Doc. 18, at 8 *with* Doc. 5, at 1-2.) "The general maritime law is a body of concepts, principles and rules, originally customary and

---

[3] The determination of whether a duty exists is a fact-intensive one, as FYC appears to recognize in citing to *Prosser & Keeton on Torts* in its reply (*see* Doc. 19, at 2 ("The existence of a duty depends on 'whether, **upon the facts in evidence**, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.'" (emphasis supplied))); accordingly, a final determination as to whether and to what extent a duty existed toward Plaintiff's decedent in this case cannot be made until discovery on this issue has been conducted and a full picture of the facts is presented to the Court. At this juncture, although Plaintiff has attached evidence to its filing and made reference to matters outside the four corners of the Complaint, the Court only considers the allegations contained in the well-pled Complaint.

international in origin, that have been adopted and expounded over time by the federal courts." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 4-1 (5th ed., West 2011), citing *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 960 (4th Cir. 1999). The parties have also indicated that this case presents an issue of first impression as neither party was able to locate a case that delineates the duty, if any, of a yacht club or similarly situated party who controls the timing of, the registration and acceptance of entrants into the race, and the course of a sailboat race and enters into a contract (permit) whereby it accepts the responsibility of "instruction to and qualification of participants, safety equipment inspections," and provision of "a sufficient number of rescue vessels to provide adequate safety for all participants." (*Compare generally* Doc. 1 *with* Docs. 5, 18 & 19.)

Although Defendant has cited cases that are somewhat similar, upon review of those cases, the Court finds that the circumstances in this case significantly differ from those with regard to the existence of a duty. For example, in this case FYC had unique knowledge concerning the conditions on the race course and had the ability to control, and did control, the timing of the race and, in fact, whether the race occurred at all.[4] The most similar case, *Brooke v. Dennis*, 1974 A.M.C. 664 (N.D. Cal. 1973), involved the death of a participant in a sailboat race after the boat accidentally and inexplicably

---

[4] And it is because of these facts (including, FYC's failure to cancel/reschedule the race as it had done in 2010, and did the following year in 2016), as well as what appears to be FYC's superior knowledge of weather conditions and its failure (through Fitzpatrick and Hirsch) to advise race participants of those deteriorating conditions over VHF Channel 68, that FYC cannot be heard to claim at this point in the litigation that it owed no duty to Adam Clark and the other individuals in the boat he occupied on the basis that his boat had already crossed the finish line when the cataclysmic weather hit. In addition, nothing about Clark being on a boat that had already crossed the finish line before it yielded to the bad weather answers whether FYC had a duty to the occupants of the boat to immediately assist in rescue efforts.

13

broached, throwing the three occupants into the water. Unlike this case, the conditions of the sea played no part in the incident in *Brooke,* the sponsoring organization did not supply patrol craft for the race or agree to do so, no officer, director, or employee of the sponsoring organization was physically on navigable waters before, during or after the race, and there was no evidence that the sponsoring organization had any superior or unique knowledge of potential danger to the participants. Under the unique facts of that case, after finding that it lacked federal court jurisdiction over the sponsoring organization, the Court also found that the sponsoring organization owed no duty to the plaintiff's decedent and had committed no act that caused his death. *Brooke,* 1974 A.M.C. at 671.[5]

Schoenbaum offers some helpful commentary on how Courts are to evaluate claims of first impression:

> The general maritime law, however, is not a complete or all-inclusive system. When new situations arise that are not directly governed by legislation or admiralty precedent, federal courts may fashion a rule for decision by a variety of methods. Federal courts may, and often do, look to state statutory laws and to precepts of the common law which they "borrow" and apply as the federal admiralty rule.

Schoenbaum, *supra*, at § 4-1. "[F]or example, much of general maritime tort law is borrowed state law." *Id*. at § 4-2, citing *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293

---

[5] Indeed, the court in *Brooke* reached its "duty" decision only after conducting a bench trial. *Compare id. with id.* at 665 (notation that the case was tried to a magistrate judge without a jury). Therefore, if *Brooke v. Dennis,* and other similar cases cited by FYC, *see, e.g., Nieto-Vincenty v. Valledor,* 22 F.Supp.3d 153 (D. P.R. 2014) (court decision finding no duty owed by marina to the plaintiffs made at the summary judgment stage); *Travelers Indem. Co. v. Gulf Weighing Corp.,* 352 F.Supp. 335 (E.D. La. 1972) (court holding that marina was in no way negligent was entered following a consolidated bench trial); *Miami Valley Broadcasting Corp. v. Lang,* 429 So.2d 1333 (Fla. 4th Dist. Ct. App. 1983) (appeal from a judgment entered after a jury trial), offer this Court a lesson it is that the legal determination of whether a duty exists should await this Court's consideration of all relevant facts developed during discovery, whether at the summary judgment stage or following a trial.

14

(2d Cir. 2009) (applying New York statutory and common law in an admiralty case, ruling that the general maritime law incorporates common law negligence principles and state law in particular). The elements of a maritime negligence cause of action, like a common law negligence claim, are "[t]he existence of a duty required by law which obliges the person to conform to a certain standard of conduct in order to protect others against unreasonable risks," breach of that duty, proximate cause, and damage suffered by the plaintiff. Schoenbaum, *supra,* at § 5-2; *compare id. with Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) ("To plead negligence, a plaintiff must allege that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm.").

Neither party has cited the Court to any statement of maritime tort law that applies to a person or entity in the position of FYC. The "duty" cases cited do not provide clear guidance in this fact-intensive setting. Defendant argues that the absence of case law supports its position that such an entity never has a duty toward a race participant, while Plaintiff argues that application of common law negligence principles supports its position that Defendant here did owe a duty to Adam Clark. (*Compare* Doc. 5, at 19 *with* Doc. 18, at 1-3.) While not in a position at this juncture to make a pronouncement as to exactly what duty Defendant owed under the circumstances of this case, if any, the Court is also not inclined to hold that a race organizer could never owe a duty to race participants. *See, e.g., Johnson v. Galencare, Inc.,* 2014 WL 6674622, *4 (M.D. Fla. Nov. 24, 2014) (declining to address the duty, if any, owed to the plaintiff on a negligent supervision claim at the motion to dismiss stage, but instead

15

waiting to make a determination when it had the benefit of all discovery at the summary judgment stage). The Court does find that Plaintiff has set forth sufficient facts in her complaint, which, when taken as true, support "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949. Stated somewhat differently, since this Court asks, at this stage, only if the Plaintiff has adequately stated claims for which relief may be granted, FYC's arguments on duty (which also include an element of foreseeability, *see* Doc. 5, at 6-7) are "more appropriate after discovery at the summary judgment stage or at trial." *Chaparro, supra,* 693 F.3d at 1337.

## CONCLUSION

As set forth above, the Court finds that the allegations set forth in Plaintiff's Complaint meet the liberal pleading standards required by the Federal Rules of Civil Procedure and cases interpreting those rules. Taking the Plaintiff's allegations as true, this Court finds that the Complaint adequately alleges that Defendant FYC owed a duty to Plaintiff's decedent, breached that duty, and contributed to his death. The determination of the extent of the duty owed, if any, would be premature at this stage of the proceedings. Accordingly, it is **RECOMMENDED** that FYC's motion to dismiss with prejudice (Doc. 5) be **DENIED.**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); S.D.ALA. GenLR 72(c). The parties should note that under Eleventh Circuit Rule

3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 22nd day of May, 2018.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**

17