IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JANE BROWN, etc., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 18-0061-CG-MU |
| ) | |
| FAIRHOPE YACHT CLUB, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

On April 16, 2018, Defendant Fairhope Yacht Club filed a Motion to Dismiss all of the claims Plaintiffs Robert Luiten and Lennard Luiten filed against them in this action with prejudice. (Doc. 32).[1] This motion has been referred to the undersigned Magistrate Judge for entry of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. Gen. LR 72. Having reviewed and considered the relevant pleadings, the relevant law, and the orders previously entered in this action, the undersigned Magistrate Judge **RECOMMENDS** that the Motion to Dismiss with Prejudice filed by Defendant be **DENIED** for the reasons set forth below.

## SUMMARY OF PROCEEDINGS

On March 26, 2018, Plaintiffs Robert Luiten and Lennard Luiten filed a

---

[1] When the motion to dismiss was filed, the action was styled as *Luiten, et al. v. Fairhope Yacht Club,* Civ. A. No. 1:18-cv-0140-WS-N; however, the Luitens' action was consolidated with two other pending actions into a single action styled as *Brown v. Fairhope Yacht Club,* Civ. A. No. 1:18-cv-0061-CG-MU on May 24, 2018. This motion and the responses thereto were then carried over and assigned new document numbers.

complaint against Defendant Fairhope Yacht Club ("the Yacht Club" or "FYC"). (Doc. 30). In their complaint, the Luitens assert claims against the Yacht Club for negligent infliction of emotional distress, failure to provide assistance at sea, and wanton or gross negligence. (*Id*. at pp. 7-9). The Yacht Club filed the instant motion to dismiss the claims on April 16, 2018. (Doc. 32). The Luitens filed a response and brief in opposition to the motion to dismiss on May 2, 2018, and FYC filed a reply brief in response to their opposition on May 14, 2018. (Docs. 33 & 34). The motion is now ripe for decision.

## SUMMARY OF ALLEGATIONS[2]

The Luitens' Complaint alleges the following:

On April 25, 2015, Defendant Fairhope Yacht Club sponsored and hosted the 2015 Dauphin Island Race, which was a boat race that began in Baldwin County, Alabama, and concluded in Mobile County, Alabama, at Dauphin Island. (Doc. 30 at pp. 1-2). The race participants included Plaintiff Robert Luiten and his then 17-year old son, Lennard. (*Id*. at p. 2). The Luitens sailed a 24-foot vessel, which was owned by Robert, and were accompanied by Jimmie Charles ("J.C.") Brown, Jacob Pouncey, and Adam Clark. (*Id*.). Lennard Luiten was acting as the skipper for the race. (*Id*.).

In the months leading up to the race, the Yacht Club's Race Committee, the group responsible for the planning and safe conduct of the race, chose not to develop any form of safety plan to respond to emergencies that might arise

---

[2] For consideration of this motion to dismiss, Plaintiffs' factual allegations have been accepted as true and viewed in the light most favorable to Plaintiffs. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

during the race, nor did the FYC Committee create any weather plan to inform its decision-making in the event of severe weather. (*Id.*). Before the race, the Yacht Club applied to the United States Coast Guard (Coast Guard or USCG) for a permit to conduct the race. (*Id.*). In its application, FYC represented to the USCG that no unusual hazards to participants would be introduced into the Regatta Area. (*Id.*). While the Yacht Club listed no specific vessels it was providing for safety purposes on the application, it represented that it deemed its patrol adequate for safety purposes and requested no Coast Guard or Coast Guard Auxiliary Patrol. (*Id.*).

    The Coast Guard issued the permit and made it clear that the Yacht Club was responsible for the safe conduct of the event, including, but not limited to, instruction to and qualification of participants, safety equipment inspections, and rescue and first aid facilities. (*Id.*). The Coast Guard also instructed the Yacht Club that it "must be constantly aware of weather forecasts and conditions so that unsafe conditions can be identified and responded to, including termination of the event if necessary to ensure safety of all participants." (*Id.*). The Coast Guard permit specifically stated that: "This permit is issued on the condition that the sponsor furnish a sufficient number of rescue vessels to provide adequate safety for all participants. These vessels must be adequately identified as Event Committee Boats. They are direct representatives of the sponsor who is responsible for briefing and coordinating each vessel 's operation ensuring positive control for the event." (*Id.* at pp. 2-3).

    The Yacht Club's Principal Race Officer and current Commodore has

3

testified that FYC looks to the guidance of the U.S. Sailing Association of which it is a member. (*Id*. at p. 3). The U.S. Sailing Association's Race Management Handbook specifically places duties upon a race or regatta organizer, including: "If foul weather threatens, or there is any reason to suspect that the weather will deteriorate – for example, lightning or a heavy squall – making conditions unsafe for sailing or for your operations, the prudent and practical thing to do is abandon the race." (*Id*.). The Race Management Handbook further explains: "in deciding to postpone, shorten, or abandon for foul weather, the race committee's job is to exercise good judgment, not win a popularity contest. Make your decisions based on consideration of all competitors, especially the least experienced or least capable competitors. Don't worry if conditions moderate later and make you look overcautious. Your concern is the safety of participants." (*Id*.).

At 6:11 p.m. on the evening before the race, the National Oceanic and Atmospheric Administration (NOAA) issued a weather forecast that indicated severe thunderstorms were possibly headed towards the Mobile Bay area. (*Id*. at pp. 3-4). On the morning of the race, April 25, 2015, at 3:48 a.m., the NOAA's weather forecast indicated severe thunderstorms possible near the Mobile Bay area. (*Id*. at p. 4). The National Weather Service (NWS) in Mobile also issued severe thunderstorm warnings for Mobile and Baldwin Counties the morning of the yacht race. (*Id*.). The Yacht Club hosted a breakfast event from 7:30 am to 8:30 a.m. for race participants. (*Id*.). The race was originally scheduled to begin at 9:30 a.m. (*Id*.). At approximately 7:44 a.m. on the day of the race, the Yacht

Club caused a cancellation notice to be posted on its website for about 30 minutes, stating that the race had been cancelled due to inclement weather. (*Id.*). The cancellation notice was removed at the direction of the Yacht Club at about 8:10 a.m. (*Id.*). Both the prior 2010 Dauphin Island Race and the subsequent 2016 Dauphin Island Race were cancelled and moved by the yacht club organizing the race those years due to inclement weather. (*Id.*).

Before the start of the race, FYC informed all participants that it would communicate with them on Channel 68 of the VHF radio band. (*Id.*). Due to the Yacht Club's original decision to cancel the race, the start time of the race was delayed. (*Id.*). The Yacht Club also ordered a restart of the already delayed race that further delayed the official start. (*Id.*). The race ultimately began at 11:00 a.m., instead of the originally scheduled 9:30 a.m. start time. (*Id.*). In all, approximately 476 people were on board 117 boats when the yacht race began after the restart. (*Id.*).

At about 1:35 p.m., the Storm Prediction Center posted another severe thunderstorm watch for the area including Mobile Bay. (*Id.*). At about 2:21 p.m. the NWS in Mobile issued another severe thunderstorm warning for Mobile County as a line of storms began to approach from the western border of Alabama. (*Id.* at pp. 4-5). At approximately 2:30 p.m., the USCG called the Race Committee aboard the Race Committee Boat at the finish line via telephone and advised that potentially severe weather was incoming. (*Id.* at p. 5). Sometime shortly thereafter, the USCG made a VHF radio transmission to the Race Committee Boat stating that it was "on station" nearby. (*Id.*). At about 2:47 p.m.,

the NWS issued a second severe thunderstorm warning, this one for the Baldwin County area. (*Id.*). At about 3:10 p.m., the storm entered Mobile Bay from the west. (*Id.*). As a result of the delayed start, most of the boats in the race were still in Mobile Bay at 3:10 p.m. (*Id.*). At about 3:15 p.m., Middle Bay Lighthouse recorded a wind gust of 73 MPH, which is one MPH under hurricane strength. (*Id.*). In addition to the land warnings, marine warnings were also issued. (*Id.*).

As the deadly storm entered Mobile Bay, the Yacht Club's Principal Race Officer, Anne Fitzpatrick, and Race Committee Co-Chairman, John Hirsch, occupied a forty-eight (48) foot motor yacht positioned at the finish line near Dauphin Island. (*Id.*). This vessel, owned and/or controlled by Mr. Hirsch and/or Ms. Fitzpatrick as representatives of FYC, was capable of safely rendering assistance to nearby boats in danger of sinking. (*Id.*). However, despite their awareness of the danger faced by nearby race participants, Ms. Fitzpatrick and Mr. Hirsch chose not to participate in any rescue efforts until the race ended. (*Id.*).

During the storm, the Luitens' sailboat capsized, and all five occupants were thrown into the bay. (*Id.*). As they struggled to remain afloat amidst eight foot waves, both Luitens witnessed the drowning deaths of their friends, 71-year old J.C. Brown and teenager Adam Clark. (*Id.* at pp. 5-6). After approximately twenty minutes in the water, Lennard Luiten chose to swim for help while his father remained with Jacob Pouncey. (*Id.* at p. 6). The powerful current soon swept Lennard south toward the mouth of Mobile Bay. (*Id.*). Robert Luiten and

Jacob Pouncey were in the water fearing for their lives for nearly two hours after their sailboat capsized until they were rescued by a vessel searching for survivors. (*Id.*). Lennard Luiten was not rescued until well after nightfall, having spent approximately six hours in the water, during which he feared for his life. (*Id.*). A total of ten (10) boats sank during the race, putting forty (40) people into the water, six (6) of whom, including Brown and Clark, lost their lives. (*Id.*).

In the months and years following the storm, Robert and Lennard Luiten have both experienced severe post-traumatic stress and depression resulting from their near-death experience that included witnessing the drowning of two friends. (*Id.*). Due to the effects of these conditions, Lennard Luiten experienced reduced mental and emotional capacities, which prevented him from attending college as he had previously planned to do. (*Id.*). Robert Luiten has also experienced reduced mental and emotional capacities, which impaired his ability to function as a self-employed business consultant. (*Id.*). Robert Luiten's sailboat could not be located after the storm and was, therefore, deemed a total loss. (*Id.*).

Count One of the Luitens' Complaint asserts a cause of action for negligent infliction of emotional distress. (*Id.* at p. 7). The Luitens allege that the Yacht Club, as the sponsor of the race, had a duty to exercise due care for its race participants. (*Id.*). The Luitens further allege that the Yacht Club's decision to reverse its initial decision to cancel the race due to the threat of inclement weather was negligent and that its negligence in this regard caused the boat occupied by the Luitens to be positioned directly in the path of the storm.

(*Id.*). The Luitens also allege that the Yacht Club negligently induced and incentivized race participants to race in extremely dangerous severe weather, negligently failed to warn the race participants of the approaching severe weather system of which it was aware even after it received a call from the USCG, and negligently or willfully violated its USCG permit by not providing for sufficient safety and rescue boats, by failing to be constantly aware of weather forecasts and conditions so that unsafe conditions could be identified, by not communicating with participants regarding unsafe conditions, and by not terminating the event to ensure the safety of all participants. (*Id.*). According to the Complaint, these actions were a breach of the Yacht Club's duty to exercise reasonable or due care as identified in the applicable USCG permit and the U.S. Sailing Association's Race Management Handbook. (*Id.* at pp. 7-8).

In Count Two, the Luitens assert a cause of action against the Yacht Club for failure to provide assistance at sea as required by 46 U.S.C.A. § 2304. (*Id.* at p. 8). They allege that the co-chairs of the Yacht Club's race committee, who were anchored at the finish line aboard a 48-foot motor yacht, were aware or should have been aware of the general location of the Luitens' vessel and the imminent danger faced by the occupants of the vessel. (*Id.*). They further allege that Hirsch and Fitzpatrick, as the owners or persons in charge of the Yacht Club Race Committee Boat, had a duty to render assistance to nearby vessels, including the Luitens' vessel; understood that the Yacht Club vessel and its ten occupants were capable of safely rendering assistance to the stranded race participants; and, yet, chose to wait until the scheduled end time of the race,

nearly two hours after the storm had passed, before joining rescue efforts already underway, even though they believed vessels and participants were in jeopardy. (*Id*.). The Luitens assert that the Yacht Club is vicariously liable for the actions of Hirsch and Fitzpatrick because, at all relevant times, they were acting in their capacities as officers of the Yacht Club and co-chairs of its Race Committee. (*Id*. p. 9).

In Count Three of their Complaint, the Luitens assert a cause of action for wanton or gross negligence by the Yacht Club that caused their damages. (*Id*.). Specifically, they allege that the Yacht Club wantonly disregarded its duty to warn the race participants of the severe weather alerts being issued by the various news and weather outlets, as well as the warnings made directly to the Yacht Club by the USCG. They also allege that the Yacht Club acted with wanton disregard by failing to cancel the race and placing its own interests above the safety of the race participants without regard to its obligations under its USCG permit and as a member of US Sailing Association in sponsoring such a race. (*Id*.).

## **STANDARD OF REVIEW**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint on the basis that the plaintiff has failed to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss on such grounds, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (citation omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.... [This standard] asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and must be a "'plain statement' possess[ing] enough heft to 'sho[w] that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 555, 557 (second brackets in original). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. In determining whether a claim is stated, the factual allegations are accepted as true, except for conclusory assertions or a recitation of a cause of action's elements, and the allegations must be considered in the light most favorable to the plaintiff. *See id.; Mitchell v. Farcass,* 112 F.3d 1483, 1490 (11th Cir. 1997). Even if articulate and well-plead, "[a] complaint is subject to dismissal for failure to state a claim 'when its allegations, on their face, show that an affirmative defense bars recovery on the claim,'" *Douglas v. Yates,* 535 F.3d 1316, 1321 (11th Cir. 2008) (quoting *Cottone v. Jenne,* 326 F.3d 1352, 1357 (11th Cir. 2003)), or "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action," *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## **CONCLUSIONS OF LAW**

In this case, the undersigned will not substantively deviate from the analysis in *Brown v. Fairhope Yacht Club,* Civ. A. No. 18-0061-CG-MU, Doc. 24, and, instead, simply sets out that same analysis, with only minor additions. As in *Brown,* the Yacht Club's motion to dismiss for failure to state a claim is based on its contention that it owed no duty as the entity that conducted the Dauphin Island Race to the participants in the race under the general maritime law, and therefore, cannot be held liable in this action. (Doc. 32). The Luitens argue that their complaint does indeed set forth facts which show that FYC owed them a duty. (Doc. 33). Thus, the sole issue before the Court at this juncture is whether the Luitens' Complaint, when taking all factual allegations contained therein as true, demonstrates that the Yacht Club had or assumed a duty to participants in the race it conducted.[3]

The parties agree that the Luitens have asserted their claims under the general maritime law. (Doc. 30 at p. 1; Doc. 32 at p. 1). "The general maritime law is a body of concepts, principles and rules, originally customary and

---

[3] The determination of whether a duty exists is a fact-intensive one, as the Yacht Club appears to recognize in citing to *Prosser & Keeton on Torts* in its reply (*see* Doc. 34 at p. 2 ("The existence of a duty depends on 'whether, **upon the facts in evidence**, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.'" (emphasis added))); accordingly, a final determination as to whether and to what extent a duty existed toward the Luitens in this case cannot be made until discovery on this issue has been conducted and a full picture of the facts presented to the Court. At this juncture, although the parties have attached evidence to their filings and made reference to matters outside the four corners of the complaint, the Court will only be considering the allegations contained in the complaint.

international in origin, that have been adopted and expounded over time by the federal courts." 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 4-1 (5th ed., West 2011) (citing *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 960 (4th Cir. 1999)). The parties have also indicated that this case presents an issue of first impression as neither party was able to locate a case that delineates the duty, if any, of a yacht club or similarly situated party who controls the timing of, the registration and acceptance of entrants into the race, and the course of a sailboat race and enters into a contract (permit) whereby it accepts the responsibility of "instruction to and qualification of participants, safety equipment inspections," and provision of "a sufficient number of rescue vessels to provide adequate safety for all participants." (Doc. 30 at p.1; *see* Docs. 32, 33, and 34).

Although the Yacht Club has cited cases that are somewhat similar, upon review of those cases, the Court finds that the circumstances in this case significantly differ from those with regard to the existence of a duty. For example, in this case the Yacht Club had unique knowledge concerning the conditions on the race course and had the ability to control, and did control, the timing of the race and, in fact, whether the race occurred at all.[4] The most similar case,

---

[4] Because of these facts (including, the Yacht Club's failure to cancel/reschedule the race as was done in 2010 and in the year following this race), as well as what appears to be FYC's superior knowledge of weather conditions and its failure (through Fitzpatrick and Hirsch) to advise race participants of those deteriorating conditions over VHF Channel 68 or when they passed by the Race Committee Boat, the Yacht Club cannot be heard to claim at this point in the litigation that it owed no duty to the Luitens and the other individuals in their boat on the basis that their boat had already crossed the finish line when the cataclysmic weather hit. In addition, nothing about the boat having already crossed the finish line before it yielded to the bad weather answers whether the Yacht Club had a duty to the occupants of the boat to immediately assist in rescue efforts.

12

*Brooke v. Dennis*, 1974 A.M.C. 664 (N.D. Cal. Dec. 20, 1973), involved the death of a participant in a sailboat race after the boat accidentally and inexplicably broached, throwing the three occupants into the water. Unlike this case, the conditions of the sea played no part in the incident in *Brooke,* the sponsoring organization did not supply patrol craft for the race or agree to do so, no officer, director, or employee of the sponsoring organization was physically on navigable waters before, during or after the race, and there was no evidence that the sponsoring organization had any superior or unique knowledge of potential danger to the participants. Under the unique facts of that case, after finding that it lacked federal court jurisdiction over the sponsoring organization, the Court also found that the sponsoring organization owed no duty to the plaintiff's decedent and had committed no act that caused his death. *Brooke,* 1974 A.M.C. at 671.[5]

Schoenbaum offers some helpful commentary on how Courts are to evaluate claims of first impression:

> The general maritime law, however, is not a complete or all-inclusive system. When new situations arise that are not directly governed by legislation or admiralty precedent, federal courts may fashion a rule for decision by a variety of methods. Federal courts may, and often do, look

---

[5] The court in *Brooke* reached its "duty" decision only after conducting a bench trial. 1974 A.M.C. at 665 (notation that the case was tried to a magistrate judge without a jury). Therefore, if *Brooke,* and other similar cases cited by the Yacht Club, *see, e.g., Nieto-Vincenty v. Valledor,* 22 F. Supp. 3d 153 (D.P.R. 2014) (court decision finding no duty owed by marina to the plaintiffs made at the **summary judgment stage**); *Travelers Indem. Co. v. Gulf Weighing Corp.,* 352 F. Supp. 335 (E.D. La. 1972) (court holding that marina was in no way negligent was entered following a **consolidated bench trial**); *Miami Valley Broadcasting Corp. v. Lang,* 429 So. 2d 1333 (Fla. 4th Dist. Ct. App. 1983) (appeal from a judgment entered after a **jury trial**), offer this Court a lesson, it is that the legal determination of whether a duty exists should await this Court's consideration of all relevant facts developed during discovery, whether at the summary judgment stage or following a trial.

> to state statutory laws and to precepts of the common law which they "borrow" and apply as the federal admiralty rule.

Schoenbaum, *supra*, at § 4-1. "[F]or example, much of general maritime tort law is borrowed state law." *Id*. at § 4-2 (citing *Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293 (2d Cir. 2009) (applying New York statutory and common law in an admiralty case, ruling that the general maritime law incorporates common law negligence principles and state law in particular)). The elements of a maritime negligence cause of action, like a common law negligence claim, are "[t]he existence of a duty required by law which obliges the person to conform to a certain standard of conduct in order to protect others against unreasonable risks," breach of that duty, proximate cause, and damage suffered by the plaintiff. Schoenbaum, *supra,* at § 5-2; *accord Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012).

      Neither party has cited the Court to any statement of maritime tort law that applies to a person or entity in the position of the Fairhope Yacht Club. The "duty" cases cited do not provide clear guidance in this fact-intensive setting. The Yacht Club argues that the absence of case law supports its position that such an entity never has a duty toward a race participant, while the Luitens argue that application of common law negligence principles supports their position that FYC owed them a duty. (Doc. 32 at p. 19; Doc. 33 at pp. 9-10). While not in a position at this juncture to make a pronouncement as to exactly what duty the Yacht Club owed under the circumstances of this case, if any, the Court is also not inclined to hold that a race organizer could never owe a duty to race participants. *See, e.g., Johnson v. Galencare, Inc.,* No. 8:14-cv-2069-T-33TGW, 2014 WL

14

6674622, at *4 (M.D. Fla. Nov. 24, 2014) (declining to address the duty, if any, owed to the plaintiff on a negligent supervision claim at the motion to dismiss stage, but instead waiting to make a determination when it had the benefit of all discovery at the summary judgment stage). Neither does the fact that the Luitens were the owner and skipper of the sailboat involved here lead the Court at this juncture to make a broad pronouncement that they absolutely do not have a claim under the facts asserted in their complaint. While that fact may have some bearing on apportionment of liability, it does not justify dismissal of their case at this early stage of the proceedings. The Court, therefore, finds that the Luitens have set forth sufficient facts in their complaint, when taken as true, to support "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

## CONCLUSION

As set forth above, the Court finds that the allegations set forth in the Luitens' complaint meet the liberal pleading standards required by the Federal Rules of Civil Procedure and cases interpreting those rules. Taking their factual allegations as true, this court finds that the complaint adequately alleges that Defendant Fairhope Yacht Club owed a duty to the Luitens, breached that duty, and contributed to their injuries and damages. The determination of the extent of the duty owed, if any, would be premature at this stage of the proceedings. Accordingly, it is **RECOMMENDED** that Defendant's Motion to Dismiss with Prejudice (Doc. 32) be **DENIED.**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. Gen. LR 72(c)(1) & (2). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the **4th** day of **June, 2018**.

s/P. BRADLEY MURRAY
UNITED STATES MAGISTRATE JUDGE
